Mr. Martin? Yes, good morning, Your Honors, and may it please the Court, Kevin Martin for the appellants, and with me today— Good to have you with us, sir. Thank you, Your Honors. With me today I have my colleague, Benjamin Hayes. Your Honors, the District Court found that the parties' license agreement unambiguously means something that neither party had argued it means, and on the basis of that novel interpretation, the District Court found that the parties' license agreement unambiguously granted Virtuous its motion for summary judgment on its breach of contract claim. It then relied solely upon that finding of breach to also grant Virtuous summary judgment on the defendant's counterclaims. The District Court's approach to summary judgment reached substantively incorrect results, and this Court should either vacate or reverse. Mr. Martin, can I ask you just a threshold? Are you appealing the District Court's judgment that you also violated the reporting requirement? We didn't read the District Court to find that we violated the reporting requirement, but the District Court, as we read the decision— I agree. It just sort of—the District Court just sort of skips over that entirely, but— I mean, it briefly addressed it. What it found was that we were obliged to report the royalty-bearing products. It found that we were not required to report the non-royalty-bearing products, and so if the—we did not violate the reporting requirement, as long as the Court agrees with us as to what products are royalty-bearing or not. And so you were also just saying—I want to just make sure the decision— I literally had to make a decision tree for this case. So if we say that the District Court was wrong to conclude that there is no genuine issue of material fact about whether they are the same product, that takes out the District Court's grant of summary judgment on their main claim. It resolves any issue about damages because they don't get summary judgment on their main claim. And because that was the sole basis on which the District Court relied in granting summary judgment against you on your counterclaim, it also takes that out. That's exactly right. Now, we could, I guess, say more, but that is the least we could say, I guess, that would completely resolve this entire case? That would completely resolve the entire case. And I want to make one distinction between the Sophos products and the Invincior products as well. The Sophos products are the only products that are at issue with respect to the damages issue and with respect to the Section 5.3.1 issue. And so if the Court were to agree with us that the District Court either procedurally or substantively erred with respect to the Sophos products, those two issues also come off the table. Whether or not we agree with you on the Invincior product. Correct, Your Honor. And the Sophos products are the vast majority. When we briefed the issue, the Sophos products were 98% of the damages. I think it's now over 99% of the damages, and it's the only continuing damages are the Sophos products. The Invincior products, Detect and Prevent, the non-container Invincior products, were being phased out. That's essentially what triggered this whole litigation. After Sophos bought Invincior, it phased out the legacy Invincior products in preference for its own pre-existing, modified, non-container products. And at that point, seeing its revenue stream dry up, Virtue was sued, claiming that all of these products, even though they don't perform containment, are container products and services. I had some trouble following the ball on all these different Invincior products, but I thought there was some discussion in the district court's opinion and argument about the parties that some part of the Invincior code had been included in a number of the Sophos products. That's correct, Your Honor. So the Invincior products, both the non-container Invincior products, like Detect and Prevent, and the container products, like Spearfish Protection or Complete, had a body and source code. Now, what source code was enabled in any particular product was determined by a license file. But when you're talking about the 98% damages on Sophos products, am I correct that there's something in those products that contains some part of an Invincior code? That's right, Your Honor. So there was the Invincior machine learning source code files, the Sinomics. Sinomics appeared both in the Invincior container products and the Invincior non-container products. It was not enabled in the Invincior container products. It was not enabled in Spearfish Protection. Spearfish Protection didn't employ machine learning. Sinomics has nothing to do, it was undisputed below, Sinomics has nothing to do with containment. And so the inclusion of Sinomics, the Sinomics file, in the Sophos products did not enable those Sophos products to perform containment at all. So your argument at trial, as I understood it, was that whatever these products are, in order for virtuous to get at them, they would have to be able to prove that they were a, in terms of the contract, natural evolution or derivation of products. But that's not what the district court ruled upon, and in fact, I think there's a footnote in the opinion that says, I'm not touching this. That's exactly right, Your Honor. The district court declined to interpret that language, instead adopting this other theory of the district court's own, which was that each individual source code file, no matter what it does, is individually a container product and service, even non-container source code files like Sinomics. Well, not just a container product, but one of the container products specified in the settlement agreement, right? That's exactly right, Your Honor. And that's, again, that's clearly wrong. A product is not the same as a individual file. These products consist of tens of thousands of source code files. And so to say that the accused container products are equivalent to each of their individual source code files, that's not a plausible reading of the contract, and it's certainly not an unambiguously required reading of the contract as the district court ruled. So was your argument at trial, and I guess to a certain extent here, that the defined term in the contract, container products and services, was it's an accused container product called Invencia X Endpoint Spearfish Protection. And if it's not that, that's not part of the defined term in the contract under its plain language. And you're going to have to use the alternative methodology of natural evolution and derivation. That's correct, Your Honor. And so there's no dispute that this is... the defined term is by the name Invencia X Endpoint. I'm considering all these other products to be as if they were stated by name in the contract. He acted as if the individual source code files are themselves products, but the individual source code files are not products. You compile 10,000 of these things, you get to a product. But Sinomix itself, sitting there alone, is not a product. That's not the way they were defined in the contract. Well, the way the contract defines the container products and services are entire products by name. It's the accused container products. That's my point. That's the way they... I don't know whether any of you all did the contract or not, but the contract says what it says, and it seems like to me that that's quite a stretch by the district court. We completely agree with you, Your Honor. We think at the end of the day, there's a reason why neither party argued below that individual source code files are themselves the accused container products. It's because they clearly are not. You're saying this definition is ambiguous? Well, we think the definition unambiguously supports us, but it certainly does not unambiguously lead you to the district court's reading of the contract. What does accused supposed to mean? So accused is a reference to the underlying patent litigation. There's a reference to the underlying patent litigation. How do we know that? Well... Other than you standing up here telling us now. There are a couple of references to the patent litigation in the... So is accused container products defined somewhere? Accused container products is defined as spearfish protection. There's no accused container products defined anywhere. Outside this clause. Outside this one clause that we're talking about. Outside of this one clause, no, Your Honor. The one clause says... It's just thrown in there. Well, the one clause says the accused container products are... What's accused mean? Accused is a reference to the patent litigation, which is referenced in the definition section of the contract. Does that say that in there somewhere? What does it say? No, Your Honor. There's a definition in here of the legal proceedings, and then there's a reference later on to the settlement agreement. So this license agreement was being reached concurrent with a settlement agreement to settle the legal proceedings. So... Or it says currently called Invincia X endpoint, et cetera. The term accused container products is defined in the patent license agreement somewhere? We think accused container products is defined as spearfish protection and the prior names of the products. So it's the accused container products currently called this. And so the court can ask what does the accused container products say it is. It says it's this one product. There's no other definition of accused container products that appears in your patent agreement? That's correct, Your Honor. It's these names of these products. And, again, they're entirely... Okay. I mean, that just seems like another reason why the district court's analysis is wrong because it seems to me that I don't know what accused container products is by looking at the four corners of the contract. I have to resort to extrinsic evidence to know what that means.  At a minimum, Your Honor. At a minimum. Maybe more. Maybe more. We would say that it unambiguously supports us because it unambiguously means it's spearfish protection. It does not include products that it's undisputed Invincia also was selling at the time, like detect and prevent, that were not accused in the underlying litigation and that are not called out by name in this definition of container products and services. And so another thing the district court did wrong... We hear a lot of criminal cases here. They're thrown around in those things. It's a term of art as well. What are we supposed to think it is in this contract? It's a term of art as well, Your Honor, in patent litigation to refer to the... I know it probably is, but why isn't it in the agreement? Why wasn't it written down? I think it was included, Your Honor, because as is clear from reading the agreement as a whole, they were settled... Oh, they were patent lawyers talking to each other. It was patent lawyers talking to each other. With apologies to my client, Your Honor, the nerds got together. They drafted this license agreement. They used terms of art that are common in patent litigation and accused products identified. If it simply said the accused products, that would be probably very ambiguous. But it identifies them by name. Accused container products is the term. And it's important as well that the word container does appear both in the label and in the definition. So, Invincia at the time was selling both container products and non-container products. This calls out as royalty bearing only the container products that Invincia was selling. Where this matters a lot is when you get to that Sinomics file because the Sinomics file, which is the machine learning file, is undisputed. It has nothing to do with containment functionality. The district court found this in a summary judgment decision. And it also appeared in the Invincia non-container products, like detect and prevent. And so when they argue that we took Sinomics out of spearfish protection specifically and therefore the Sophos products or the other Invincia products. Well, if we conclude that the district court was not authorized to grant summary judgment to Virtuous, can we stop there? You can stop there, Your Honor. That would resolve all of the issues in the case. It could be remanded to the district court for further proceedings either at summary judgment or for trial if the district court decides. That's relief you want? That is relief. We're asking for vacater or reversal, but we'd be very happy, Your Honor, with vacater and remand to the district court. Moving on to the other issues, though. We do think it unambiguously supports us. With respect to the damages issue, as I mentioned earlier, that would be wiped out as long as we prevail either with vacater or reversal on the Sophos products. The same is true with Section 5.3.1. With respect to our counterclaim, again, the district court's only basis for granting them summary judgment on our counterclaim was its finding that we had breached. Even if the court were to affirm the finding of breach, which we don't think you should, we think that under the best reading of Virginia law and this court's precedence, like the Bayer crop science case, it was still error for the district court to invoke that breach as the sole basis for granting summary judgment against us on our counterclaim. If there are no further questions? Did you all have an oral argument in the district court? There was an oral argument in the district court, Your Honor, on the summary judgment. It appears in the appendix. I thought I recalled that. Thank you, Your Honors. Thank you, sir. You had some time saved. Mr. Charnas? Good to have you with us, sir. Thank you, and may it please the court. I guess let me start with the definition. And in particular, if this court is uncomfortable with the district court's ruling, this court can affirm on alternative grounds. We argue vigorously below, as this court, as some judges alluded to, that these products were derivations, natural evolutions. It was vigorously argued by both sides below, and this court can address that and affirm on that basis as well. It will be particularly wasteful, I think, to remand for the district court to address that issue in the first instance. The parties are going to say the exact same thing to the district court on that issue that we are saying here, and when it comes back here, it's going to be reviewed. Well, isn't that going to require all sorts of expert testimony to show that there's a derivation and an evolution for this sort of thing? I mean, the district courts seem to be pretty emphatic. The court need not interpret the definition of this term, period. Well, correct, because the district court rules on different grounds. I don't think you need experts on what a derivation means. In fact, the parties argue a little bit about the definition of derivation looking at different dictionary definitions, but I refer you to their brief. We'll take their definition. On page 30 of their opening brief, they say that in the context of software products, it is difficult to imagine. Are we going to be making a finding of fact in order to back up derivation and evolution? Well, there's the facts the parties agree on. There's two files called Sinomex, and I'm referring here to the Sophos products because, as my friend said, that's 99, 98% of the damages. So for the Sophos products, it's undisputed that there were two files that provided the machine learning capability, and that's the reason that Sophos paid $120 million for Invencia was for its machine learning technology, that they took those files and they put them in the relevant Sophos products. That's a factual question, but the parties don't disagree about that. What the parties disagree about is the meaning of the word derivations. Interpretation of a contract is a legal question under Virginia law, not a factual question. Can I ask you about those files? So your friend on the other side said these products, these programs, whatever we call them, have tons and tons of files in them. I assume there's no disagreement that these programs all have tons of files in them. They have a lot of files. Okay. So, and I think we all agree, I think you're right, I think your friend on the other side agrees, the products that you're suing about have a file that is also in the Invencia X Endpoint Spearfish Protection, right? Do we know in the record whether that common file was original to the Endpoint Spearfish Protection or if it was originated in yet an even earlier program? You know what I'm saying? Like, is there a common ancestor? What I guess I'm trying to figure out is whether this is, to go back to something Judge Agee was saying, one possibility, the fact, one explanation for why these two programs share the same file is that one is a descendant from the other. The other possibility is that they have a common ancestor. Well, I don't think there's any dispute that Sophos, after it purchased Invencia, took the Sinomex files from Invencia's products and put them in... Well, but hold on, it's not enough that they're from Invencia's products. They have to be, according to this agreement, from Invencia X Endpoint Spearfish Protection, not any Invencia product. And there's no disagreement that they were from Spearfish Protection. Now, the interesting thing about this definition is Spearfish Protection is not the only product that's mentioned. There's several products, including a product called Invencia Advanced Endpoint Protection. And contrary to what my friend said, Advanced Endpoint Protection was a machine learning product. It had both container and machine learning. Refer the court to pages 73 to 74, 494 and 556 of the joint appendix. So machine learning was in the defined products, container products and services. And that file was taken from Spearfish Protection and placed into their product. Well, then this just seems to me to be another argument why this is at minimum ambiguous. Because as your friend on the other side put it, the nerds got together and drafted this. This definition does not say Endpoint Spearfish Protection and Advanced Endpoint Protection are different products. What it says is Endpoint Spearfish Protection, currently called, is formerly known as these other three. But this definition seems to assert that all four of those things were the same thing. And now you're representing to me that that is not in fact true, that these four things are not the same thing. I think I agree with you. I think there are different iterations of it. But again, the word derivation, under Virginia law, that's a legal question. What is a derivation? Now, there are facts that go into the court's application of whether the... Well, including whether these things are actually different things or the same thing or not, right? Yes, but I don't think that's relevant here. Again, look at their definition of evolution. They say the only thing it can be, it's difficult to imagine what natural evolutions and derivations could be other than new products that carry forward containment source code files from an earlier generation product. Now, there are two issues there. There's carry forward files from an earlier product and there's they have to be containment files. Those are two separate questions. Let me address the broader one and then I'll go back to containment because we disagree about that, obviously. So, take out the word containment for a second. Carry forward source code files from an earlier generation product. That's exactly what they did here. Now, to answer your question, there are 10,000, 20,000 files in a software product, but there are only a few files that provide the actual functionality, the key functionality for the file. Sinomex is only two files, but those two files provide all of the machine learning capability for the product. So, it's not like they're two... It's not like they're one one-hundredth of one percent of the files. This is trying to get around their change the font example that says, read literally if the district court is right, then you literally, if you steal someone's font, you've also... Right. And clearly the district court, I mean, the district court didn't explain in detail, but clearly that's not what the district court meant. And again, that's irrelevant, you know, that's even irrelevant if you get to the derivations point. So, is there any stipulation of facts on any of these items you're talking about? There were no stipulations of facts, but I also don't think the parties disagreed about these facts. Sinomex was... It takes me back, I think, to the first question that I asked you, or first concern that I expressed was that to reach the points of law, as you indicate they are, would require the court of appeals to establish an entire body of facts which have never been found by the district court or stipulated to by the parties. I don't think that's right because the... Our position is that the key facts are not disputed. The two Sinomex files were in Spearfish Protection. Sophos purchased Invincia primarily to obtain that machine learning technology provided by the Sinomex files. They then took the Sinomex files and put them in the Sophos products that are at issue. I mean, you can ask my friend when he gets back up, but I think the parties agree about that, and we say by itself those facts establish that the two Sophos... Those are great questions in the district court. I'm sorry? Those are great questions in the district court. But the district court's summary judgment opinion says the same thing. He says the court said that the Sinomex files were taken and placed into the two disputed Sophos products. I don't think there's any disagreement about that. The question is what does that make the Sophos products a derivation? And we think that it does, even if you accept their definitions of it, because the two key files were taken and put in the Sophos products. And that leaves the issue about whether they have to be quote-unquote container files. And we think the answer to that is plainly no. You know, the parties could have written the definition differently to say the container product... What do you say to the accused words? Well, it's a little bit of a puzzle, because contrary to what my friend said, spearfish protection was not accused in the patent litigation. Right here you disagree on the facts right now. Well, I think... Just on that one point. I don't think that's... I think that... Well, I don't know that we disagree or not. Let me just cite to the joint appendix 483 to 84, which is the expert report in the patent litigation. If you all agree what accused container products means, why didn't you write it down and put it in a stipulation and put it in the record that came up here on the field? Well, I think we disagreed about what it meant. You disagreed? We did disagree about what it meant. They say, for example, that... They say the word container or the description container carries forward to natural evolutions and derivations, and we disagree with that. I think, again, I don't think we disagree about the essential facts of what is underlined. Did you say that disagreement is irrelevant? No, that disagreement is very relevant. I mean, if we're right that derivations and natural evolutions do not have to be container products, then I think that establishes by itself that the two SOFOs products are natural evolutions and derivations. And I think, again, because I don't think there's a factual dispute about that between the parties. I don't think it's necessary, and because the interpretation of a contract is a legal question for the court, and because the parties argued this precise issue both below and in our briefs here, I don't think a remand for the district court to take a look at that legal question is necessary. So, you know, for us, the real question, where the rubber hits the road, is whether the derivations must be container products, and we just think that that's not the case. The parties could have written this provision to say container products and services shall... Are you saying it's ambiguous or unambiguous? I think it's unambiguous and supports us. I thought that's what I thought you said. I'm glad I'm predictable, Your Honor. The parties could have... There's no other way around it. We're both assert... yes. The parties could have said the accused container products means spearfish production and what was previously known, as well as natural evolutions and derivations of those products that provide container technology. But it didn't do that. I mean, it's common sense and ordinary use of the English language that a second product can be a derivation of the first product, even though it provides different functionalities. I mean, a frog is a derivation of a tadpole, even though their functions are different. And the parties could clearly have made it clear that they meant that the derivations be container products. And that's particularly important because none of these products that are mentioned in the definition, spearfish or the other ones, did only one thing. I mean, these are complicated technologies that do a bunch of different things. And so... Well, that gets to me to what another source, again, with all respect for whoever wrote this clause. I don't know what the word product means. Like, I think part of the debate between the parties and the district court is literally what is the definition of a product. And I don't know, based on the plain language of this definition, how I'm supposed to know what a product is. Is a product source code? Is a product a discrete type of functionality? Is a product, you know, all the way at the end, right? Like, it feels like one of the many difficult questions about this case is what is the definition of a product. Well, I don't think the parties have disagreed about what a product means. I don't think we've discussed in the briefs. I mean, I think if you can spew out... No, but I think it's a lurking... Like, there's lots of things where I think the parties are basically just talking past each other. And when I try to interrogate why it is I think you're talking past each other, it's like I'm not sure that anybody in this case agrees what the definition of product is. Well... Because the district court thinks it's some random lines of code, which I've noticed that in the 15 minutes you've been up here you've made no effort whatsoever to defend. Well, I don't really think that's what... I think the district court was using shorthand. I don't think that's what the district court meant. I agree with you that, you know, that... So was that shorthand for derivations and evolution? No, because the district court plainly said that he wasn't getting to derivations. He didn't need to get to... So what's the shorthand for? I mean, it seems like the shorthand would be, well, the agreement has a specific product by name, doesn't include any others, therefore you then move on to evolution and derivation. So what's the shorthand here? Well, let's be clear about the Invincia products. The Invincia products that are at issue, prevent and detect, are identical. The source code is identical to Spearfish Protection. So the district court was actually... He didn't focus on it and the parties haven't up here because it's only a small percentage of the damages, but the district court was absolutely correct. Wait, when you say that... Sorry, when you say it's identical, you mean literally every single line of code is the same? Yes, that's the Invincia. That's the Invincia, not the SOFA. But that's not true of the SOFA's products? Correct. Okay. Yes. Which is 99% of the damages. Now, counsel said, well, there's a license file that changes what's available. But as we pointed out in our brief, there's no summary judgment evidence of that at all. The only thing they cite really is our expert who says he understands, quote, unquote, this is how it works. In his opening expert report, he says, I understand this is how it works because that's how it's been described. After their expert submitted his expert report, our expert submitted a rebuttal report and said, well, wait a second. Their expert never saw the license file. They refused to produce the license file in the litigation. Their expert in his report doesn't say the license file functions this way. There's really no basis for anyone saying the license file does this as far as we can tell all these products are the same. And, again, that's only 1%, 2% of the damages. But the district court, I think, was right about that. Now, with respect to the SOFA's products, you know, I think you have to extrapolate a little bit from the district court's reasoning on that. And I think the easier course is just to go right to derivations, which, as I said, the parties argued below and here, and it's, I think, well presented. Moving on quickly to a couple of the other. You all finished your discovery and everything here. You had full discovery. Yes. If we say the summary judgment was erroneous and sent it back, you are ready to go to trial. Well, we're ready to go to trial, yes. Ready to go to trial, yeah. Now, I suppose, you know, what we might do, we haven't thought about this, but we might do, it goes back down as move for summary judgment, and the other side might as well. Again, on the derivations point, because the district court didn't get to that in its previous summary judgment order. And since we think it is unambiguous in our favor, they think the same, I suppose there probably would be a new round of summary judgment briefing. But I don't know. That depends on what the district court wanted to do, obviously. And it would be a different district judge as well. You know, council raised section 5.3.1. You know, we think 5.3.1 does not apply. It has a very specific definition of an acquiring entity. In sections 5.2 and 5.3, nobody disputes that neither 5.2 nor 5.3 applies here. And therefore, 5.3.1, which provides sort of a safe harbor to SOFOs or to any acquiring, to an acquiring entity, excuse me, does not apply here. Now, it's true that our position is that SOFOs stepped into the shoes of Invincia, but it did so not under section 5 of the contract, but under Virginia common law. As the district court found, it was a success or an interest. District court found this in its motion to dismiss opinion, which SOFOs has not appealed or is not challenged in its briefing, at least. So our position is that that's the law of the case. With respect to the counterclaim, council complained also that the district court, or how the district court and the fact that the district court applied the first material breach doctrine under Virginia law, which is very well established. But again, the court can bypass the questions of law by resolving the dismissal of the SOFOs on a pleading basis essentially, or an evidentiary basis, I should say, which is that there's no material facts in dispute here. The fact of the matter is that SOFOs sent multiple communications to Virtuous asking us to sign an agreement, but the agreement was not between us, Virtuous, and Sandboxy, which is the entity that the contract requires us to sign a contract with. The communications expressly asked us to sign a contract with a third party called NetTainer. You can look at the agreement, the proposed agreement they sent over, which is the party's site and is in the joint appendix, and you can also look at the emails that their council sent. Their council sent multiple emails asking, and I'll just quote one of them. He said, will you sign, quote, a new form of a patent license agreement between Virtuous and NetTainer, unquote. It's page 343 of the joint appendix. So they asked us to sign an agreement with NetTainer, a third party. The contract doesn't require at all us to execute any agreements with third parties. They never asked us to sign an agreement with their subsidiary, Sandboxy, who they say that they were planning, or at least talking about spinning off. The last point I want to make is, let's go back to the main claim and the damages question, and this relates to what the briefs refer to as the MSP program. This does, if the court affirms the summary judgment on the SOPHOS liability, this is a fairly sizable percentage of the damages that the district court awarded. The question is whether royalties are owed on these monthly renewals in the MSP program. The way this program works, and again, I don't think there's any dispute about the facts here, small businesses get the program, the SOPHOS programs, they pay on a monthly basis. If they want the product for another month, they have to pay for another month. If they don't pay for the product, their use of the product gets terminated after a month. And we think that plainly establishes, as the district court properly found, that this is a monthly renewal, and the contract is perfectly clear that renewals of existing licenses trigger the royalty obligation. SOPHOS argues in its brief that, well, this doesn't apply, the renewal doesn't apply here because there has to be a separate distribution of the software, and there's no redistribution to the monthly program, to the monthly users in this program. A couple of quick points about that. First of all, there's actually no evidence in the record that there's no redistribution. There's no evidence, they didn't present any evidence at all about that question. So at summary judgment, I don't think they can rely on that. And I think that's refuted by the fact that the contract expressly says that renewals of licenses by themselves without a redistribution trigger the royalty obligation. So my time is about up if there are no further questions. Thank you. Thank you very much, Mr. Charter. Mr. Martin. Thank you, Your Honors. Just very briefly on the natural evolutions and derivations issues, at best there's, for the other side there's ambiguity and disputes of fact. We think that in a definition of container products and services that specifically identifies only InVinci as container products and none of InVinci as non-container products, that you cannot say that even files like Sinomix that appeared in the products too, are sufficient to make something a natural evolution or derivation of the container products specifically. We certainly did not agree to any definition of derivations which would pick up non-container products. Just as a factual matter to answer a question that came up, to sort of talk about the timeline a little bit, when the license agreement was signed, this X by InVinci had already been released. There were three versions of X by InVinci. There was Spearfish Protection, which used containment. That gets named in the license agreement. There was also Detect and Prevent. Those had the same underlying source code files, but they did not provide containment. So they were not accused in the underlying patent infringement litigation of infringement. They did not get named as accused container products in the license agreement. Under Virginia law, the purposeful exclusion of the non-container products, Detect and Prevent, has to be given force. You don't just ignore the fact that the parties included some things in the definition and excluded others. And so the only natural reading of that is that Detect and Prevent are not accused container products. They are not natural evolutions and derivations of the container product. It would make no sense to say that the products they decided not to name somehow get swept in the back door as natural evolutions and derivations of the product that they did name that existed at the same time. It also makes no sense to say that products that appear in unnamed programs are enough to make something a natural evolution and derivation of the named program. With respect to the counterclaim, I just want to say that there are a lot of factual disputes about the counterclaim. We did not move for summary judgment on our counterclaim, only they did, precisely because we think there were disputes of material fact. I would note, for example, at JA Appendix 344, we made clear to the other side in the e-mail correspondence that what we really wanted to do was invoke the license agreement's contractual provision for a spinoff of Sandboxy. While we might have used Netainer, the new proposed parent, as shorthand for Sandboxy after the spinoff, we were clear about what provision in the contract we were referencing and what we were trying to do there. Unless the Court has any further questions. Thank you, Your Honor. Thank you very much.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens